UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| THOMAS POOR BEAR,<br>DON DOYLE,<br>CHERYL D. BETTELYOUN, and<br>JAMES RED WILLOW,<br><br>            Plaintiffs,<br><br>   vs.<br><br>THE COUNTY OF JACKSON, a political<br>subdivision and public corporation<br>organized under the laws of the state<br>of South Dakota;<br>THE BOARD OF COMMISSIONERS<br>FOR THE COUNTY OF JACKSON, a<br>political subdivision and public<br>corporation organized under the laws<br>of the state of South Dakota;<br>VICKI WILSON, in her official capacity<br>as the Jackson County Auditor;<br>GLEN BENNETT, in his official<br>capacity as Jackson County<br>Commissioner;<br>LARRY DENKE, in his official capacity<br>as Jackson County Commissioner;<br>LARRY JOHNSTON, in his official<br>capacity as Jackson County<br>Commissioner;<br>JIM STILLWELL, in his official capacity<br>as Jackson County Commissioner; and<br>RON TWISS, in his official capacity as<br>Jackson County Commissioner;<br><br>            Defendants. | 5:14-CV-5059-KES<br><br><br><br><br>ORDER DENYING<br>MOTION TO DISMISS |

In this action, plaintiffs seek injunctive and declaratory relief that would

require defendants to establish a satellite office for voter registration and in-

person absentee voting in the town of Wanblee on the Pine Ridge Indian

Reservation. Docket 1. Defendants move to dismiss the complaint in lieu of

filing an answer. Docket 22. For the following reasons, the motion is denied.

## BACKGROUND

The facts, according to the complaint, are as follows:

Plaintiffs are enrolled members of the Oglala Sioux Tribe who reside on

the Pine Ridge Reservation in Jackson County, South Dakota. All plaintiffs live

in the town of Wanblee except Cheryl Bettelyoun, who lives in the nearby town

of Long Valley. Defendants are the entities or individuals responsible for

conducting voting in Jackson County. All individual defendants are named as

defendants in their official capacities only.

In South Dakota, the voter registration deadline is 15 days before an

election. SDCL 12-4-5. Each county auditor and municipal finance officer is

responsible for conducting voter registration and maintaining voter registration

records. SDCL 12-4-2. Any person qualified to vote may register at the

secretary of state's office and at locations that provide driver licenses, food

stamps, and certain other forms of public assistance. *Id.*

Any registered voter may vote by absentee ballot beginning 46 days prior

to an election. SDCL 12-19-1; 12-19-1.2. Registered voters seeking to vote

absentee may apply by mail or in person for an absentee ballot. At any time up

until the day before the election, registered voters may apply in person to the

person in charge of the election for an absentee ballot. SDCL 12-19-2.1.

Jackson County has a total population of 3,031 people and a voting population of 2,034. According to the 2010 census, American Indians and Alaska Natives comprise 52 percent of the overall population and 44 percent of the voting population of Jackson County. Whites comprise 42.7 percent of the overall population and 51 percent of the voting population. Kadoka is the county seat of Jackson County and is located outside the Pine Ridge Reservation. Kadoka's population is 94.5 percent white and 5.2 percent American Indian/Alaska Native, and the voting population is 84 percent white and 12 percent American Indian/Alaska Native.

The Pine Ridge Reservation, located in southwestern South Dakota, encompasses the southern half of Jackson County. The total population of the Pine Ridge Reservation is 18,834 people, approximately 88 percent of whom are Native American. Wanblee is the most populous city in that portion of Jackson County that is located on the Pine Ridge Reservation. Wanblee's population is 95.5 percent Native American and 1.6 percent white. Ninety-two percent of Wanblee's voting population is Native American and 3.5 percent is white. Wanblee is located roughly 27 miles from Kadoka.

Poverty and unemployment are both significantly higher for Native American residents of Jackson County than for white residents of Jackson County. Nearly 53 percent of Native Americans in Jackson County live below the poverty level, 44.2 percent are unemployed, and 75.1 percent received food stamps in the past year. Of white residents of Jackson County, 11.5 percent live below the poverty level, 1.4 percent are unemployed, and 1.5 percent

3

received food stamps in the past year. The Native American population of Jackson County also has less access to transportation than members of the white population. Every white household in Jackson County has a vehicle available but 22.3 percent of households with a Native American member have no vehicle. There is no reliable public transportation system in Jackson County.

The only location in Jackson County that offers both in-person voter registration and in-person absentee voting is the county auditor's office in Kadoka. As a result, Native American residents of Jackson County must travel, on average, twice as far as white residents to take advantage of the voter registration and in-person absentee voting services available in Kadoka. Native Americans have faced a history of voting discrimination in South Dakota and Jackson County.

On May 6, 2013, plaintiff Thomas Poor Bear, who is the Vice President of the Oglala Sioux Tribe, asked the Board of Jackson County Commissioners to establish a satellite office for voter registration and in-person absentee voting in Wanblee for the primary and general elections in 2014 and for all future elections. Between November 2013 and February 2014, South Dakota's Help America Vote Act (HAVA) task force revised the state's HAVA plan. In February 2014, the task force approved a plan that included a provision allowing Jackson County to use HAVA funds to establish a satellite office.[1] The Board of

---

[1] The United States Election Assistance Commission published the revised HAVA plan on July 2, 2014. 79 Fed. Reg. 37732-01 (notice of online

Jackson County Commissioners was informed of the available HAVA funds in April 2014. On June 20, 2014, the Board of Jackson County Commissioners voted not to approve a satellite office in Jackson County because it believed funding was not available and the satellite office would be an additional expense to the county.

On September 18, 2014, plaintiffs filed the complaint in this action seeking injunctive and declaratory relief. Docket 1. Plaintiffs allege:

> As a result of Defendants' refusal to establish the proposed satellite office in Wanblee, Plaintiffs and other Native American citizens residing in Jackson County face significantly greater burdens and have substantially less opportunity than the white population to avail themselves of the convenience and benefits of casting in-person absentee ballots and using in-person registration. The Defendants' decision to reject a satellite location provides a convenience and advantage for white residents that is not equally available to Native American residents. As a consequence, Native Americans will not have an equal opportunity to participate in federal and state elections . . . .

Docket 1 at 12-13. On that basis, plaintiffs claim that (1) the defendants violated § 2 of the Voting Rights Act (VRA)[2] because the lack of a satellite office resulted in the denial of equal opportunity to participate in the electoral process and elect representatives; and (2) the defendants acted with a discriminatory purpose, in violation of § 2 of the VRA and the Fourteenth Amendment. Docket 1 at 13-14.

On October 10, 2014, plaintiffs moved for a preliminary injunction ordering defendants to establish a satellite office for in-person registration and

---

publication). The revised HAVA plan became effective August 1, 2014.

[2] 52 U.S.C. § 10301 (formerly 42 U.S.C. § 1973).

5

in-person absentee voting in Wanblee in advance of the November 4, 2014, general election. Docket 13. The parties participated in a settlement conference on October 15, 2014, before United States Magistrate Judge Veronica Duffy and succeeded in resolving the issues relating to the preliminary injunction.[3] Docket 21. Subsequently, defendants moved to dismiss the complaint in lieu of filing an answer, which motion is pending. Docket 22.

## LEGAL STANDARD

Defendants' motion to dismiss is brought under Federal Rule of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction, Rule 12(b)(6), for failure to state a claim upon which relief can be granted, and Rule 12(c), for judgment on the pleadings. A party challenging subject-matter jurisdiction under Rule 12(b)(1) must attack either the facial or factual basis for jurisdiction. *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). The court considers matters outside the pleadings without giving the nonmoving party the benefit of the Rule 12(b)(6) safeguards. *Id.* at 729-30. The plaintiff carries the burden of showing that jurisdiction exists. *V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000) (citation omitted).

---

[3] Because the parties resolved the preliminary injunction without action by the court, the motion for preliminary injunction (Docket 13) is denied as moot. The motion for judicial notice (Docket 14) was connected to the motion for preliminary injunction and therefore is denied as moot based on the resolution of the preliminary injunction. For the same reason, plaintiffs' motion not to consolidate the motions for permanent and preliminary injunctions (Docket 15) is also denied as moot.

When reviewing a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in favor of the nonmoving party. *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 438 (8th Cir. 2013) (quoting *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012)). The court may consider the complaint, some materials that are part of the public record, and materials embraced by the complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When reviewing a motion for judgment on the pleadings pursuant to Rule 12(c), the court applies the same standard as that on a motion to dismiss under Rule 12(b)(6).[4] *See Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

---

[4] Judgment on the pleadings is appropriate only after the pleadings are closed. 5C Charles Alan Wright, et al., *Federal Practice & Procedure Civil* § 1367 (3d ed.). Because no answer has been filed, judgment on the pleadings is not appropriate at this time. In this case, the distinction between a Rule 12(c) motion and a Rule 12(b)(6) motion does not change the outcome of the court's decision because the court would apply the same standard to either motion. *Id.* § 1368 ("Because of the similarity between the Rule 12(c) and Rule 12(b) standards, courts typically will construe a premature Rule 12(c) motions [sic] as if it were brought under Rule 12(b)[.]").

**DISCUSSION**

## I.   Standing

Because federal courts are courts of limited jurisdiction, they only have the ability to hear cases that are " 'authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto.' " *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 982-83 (8th Cir. 2009) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). Under Article III there must be a case or controversy at every stage of the litigation, which requires " 'a definite and concrete controversy involving adverse legal interests[.]' " *Id.* at 983 (quoting *McFarlin v. Newport Spec. Sch. Dist.*, 980 F.2d 1208, 1210 (8th Cir. 1992)). " 'Federal courts must always satisfy themselves that this requirement has been met before reaching the merits of a case.' " *Id.* (quoting *Schanou v. Lancaster Cnty. Sch. Dist. No. 160*, 62 F.3d 1040, 1042 (8th Cir. 1995)). This requirement, also known as a matter's justiciability, is typically tested by three doctrines: ripeness, mootness, and standing. *Id.* Thus, a suit brought by a plaintiff without standing is not a case or controversy, and an Article III federal court lacks subject-matter jurisdiction over the suit. *Young Am. Corp. v. Affiliated Computer Servs., Inc.*, 424 F.3d 840, 843 (8th Cir. 2005) (quoting *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002) (" '[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction.' ").

To show standing, a plaintiff must establish a concrete injury-in-fact, a causal connection between the injury and the defendant's conduct, and a likelihood that the injury will be redressed by a favorable decision. *Lujan v.*

8

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "An injury in fact is a 'direct injury' resulting from the challenged conduct." *McClain v. Am. Econ. Ins. Co.*, 424 F.3d 728, 730 (8th Cir. 2005). A plaintiff must establish " 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.' " *Young Am. Corp.*, 424 F.3d at 843 (quoting *Lujan*, 504 U.S. at 560). "[A] generalized grievance against allegedly illegal governmental conduct" is insufficient to establish standing. *United States v. Hays*, 515 U.S. 737, 743 (1995). Discrimination based on race "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct[.]" *Allen v. Wright*, 468 U.S. 737, 755 (1984). Nonetheless, "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citation omitted) (internal quotation marks omitted).

Defendants focus their standing argument on whether plaintiffs have shown an injury-in-fact sufficient to confer standing.[5] *See* Docket 23 at 5-9. Defendants argue that the complaint contains no facts showing that the plaintiffs were unable to vote absentee or vote by regular ballot. *Id.* at 8. Similarly, defendants argue that the complaint does not allege that plaintiffs were unable to register to vote, or that plaintiffs had no transportation to

---

[5] The only argument defendants make as to causation or redressability is based on the absence of an injury-in-fact. Defendants also do not raise any prudential standing issues.

Kadoka. *Id.* According to defendants, plaintiffs have not alleged an injury, even if voting could be made more convenient. *Id.* at 8-9.

According to the complaint, each plaintiff is registered to vote in Jackson County. Each plaintiff lives in or near Wanblee. Thus, to cast an in-person absentee vote, each plaintiff would be required to travel a significantly greater distance than the white residents of Jackson County, particularly those residents living in Kadoka. According to plaintiffs, the relative difficulty and inconvenience they experience with in-person voter registration and in-person absentee voting results in less opportunity for them to participate in elections.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 560 (citation omitted) (internal quotation marks omitted). The Supreme Court has recognized that the location of and access to polling places can directly impact a person's ability to vote. *Perkins v. Matthews*, 400 U.S. 379, 387-88 (1971). Plaintiffs need not show they were unable to vote or that the challenged practices were more than an inconvenience, they only need to allege facts that, assumed to be true, show their legally protected right to equal access to the electoral process was infringed. *See Coalition for Sensible & Humane Solutions v. Wamser*, 771 F.2d 395, 399 (8th Cir. 1985) (finding standing based on allegations that "refusal to make voter registration facilities more accessible and convenient infringed [plaintiff's] right to register and thus her right to vote"); *Wandering Medicine v.*

10

*McCulloch*, No. CV 12-135-BLG-DWM (D. Mont. Mar. 26, 2014) (unpublished interim order denying motion to dismiss); *see generally* 52 U.S.C. § 10301 (prohibiting voting practices that afford protected groups "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice"). Here, plaintiffs have alleged that the location of in-person absentee voting is remote and that the distance makes it more difficult for them personally to vote absentee compared to other residents of Jackson County. These allegations are sufficient to show an injury-in-fact. Whether that alleged injury constitutes a violation of the VRA or plaintiffs' constitutional rights is a question to be determined on the merits.

## II. Voting Rights Act Results Test Claim

In their first claim for relief, plaintiffs allege that the acts and omissions of defendants have resulted in the denial of plaintiffs' right to vote, in violation of § 2 of the VRA. Docket 1 at 13-14. Section 2 provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a matter which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group],[6] as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political

---

[6] Section 10303(f)(2) states that "[n]o voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group." 52 U.S.C. § 10303(f)(2). The VRA includes American Indians as a "language minority group." 52 U.S.C. § 10310(c)(3).

11

subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). In 1982, Congress amended § 2 to clarify that a plaintiff may establish a violation of § 2 by showing a discriminatory result alone.[7] *Gingles*, 478 U.S. at 50-51. Also, the Supreme Court has stated that the VRA "should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (internal quotations omitted).

---

[7] This "results" test was adopted by Congress in 1982 to supplant an earlier Supreme Court decision that required a showing of discriminatory intent. *See Gingles*, 478 U.S. at 35.

12

A violation of § 2 occurs if, based on "the totality of the circumstances," a voting practice, standard, or procedure produces a discriminatory effect. *Gingles*, 478 U.S. at 37. The Senate Judiciary Committee Report accompanying the amended § 2 laid out a number of typical factors[8] that may be probative of a § 2 violation:

> (1) the history of voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the state or subdivision is racially polarized; (3) the extent to which the state or subdivision has used voting practices or procedures that tend to enhance opportunities for discrimination against the minority group; (4) whether minority candidates have been denied access to any candidate-slating process; (5) the extent to which minorities have borne the effects of past discrimination in relation to education, employment, and health; (6) whether local political campaigns have used overt or subtle racial appeals; (7) the extent to which minority group members have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of the elected officials to the particularized needs of members of the minority group; and (9) whether the policy underlying the use of voting qualifications is tenuous.

*Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385-86 (8th Cir. 1995) (citing *Gingles*, 478 U.S. at 36-37); *see also* S. Rep. No. 97-417, at 28 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07. These factors are "non-exclusive," *Harvell*, 71 F.3d at 1385, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45.

Plaintiffs contend that the refusal to establish a satellite in-person absentee voting office in Wanblee will result in Native American citizens having

---

[8] Hereinafter referred to as the "Senate factors."

less opportunity than non-Native American citizens to participate in elections and elect candidates of their choice. Docket 1 at 12-13. Specifically, plaintiffs claim that if Native Americans want to vote absentee in person they must travel a significantly greater distance than other residents of Jackson County, which distance acts as a barrier to Native Americans who do not have the means to travel. To support those claims, plaintiffs have provided data on the comparative residence rates of Native American and white residents in Jackson County (Docket 1 at 6-7); travel time and distance between parts of Jackson County (Docket 1 at 7); socioeconomic data demonstrating the prevalence of poverty among Native American residents of Jackson County and the disparity in socioeconomic status between Native American and white residents of Jackson County (Docket 1 at 8); data on the availability of transportation to both Native American and white residents of Jackson County (Docket 1 at 7-8); facts supporting a history of racial discrimination in voting against Native Americans in South Dakota resulting in very low Native American voter turnout (Docket 1 at 11-12); and facts showing the policy justification given by Jackson County is tenuous (Docket 1 at 9-11). These facts, accepted as true, would give weight to some of the Senate factors, particularly the first, second, fifth, and ninth. *Compare Spirit Lake Tribe v. Benson Cnty., N.D.*, Civil No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010) (granting a preliminary injunction based on a combination of facts showing that Native American plaintiffs were socioeconomically disadvantaged, could not reliably get to

14

polling places, and were more likely than others to have not received a mail-in ballot application).

Defendants contend that the complaint fails to state a claim upon which relief can be granted because the burden alleged in the complaint is not a proper basis for a § 2 claim. Docket 23 at 18-20 (quoting *Jacksonville Coalition for Voter Protection v. Hood*, 351 F. Supp. 2d 1326, 1334-38 (M.D. Fla. 2004)). Although defendants quote *Hood* at length, that decision does not resolve the issues presented in this case. *Hood* was a motion for a preliminary injunction, which requires a substantial likelihood of success on the merits. *Hood,* 351 F. Supp. 2d at 1331. In *Hood*, the plaintiffs argued that the relatively low number of early polling places in a heavily African-American county had a disproportionate impact on African-Americans. *Id.* at 1334. But the court pointed out that four of the five early polling places were in predominantly African-American neighborhoods, found that plaintiffs had presented no evidence of African-Americans experiencing difficulty voting, and concluded that the issue was one of voting convenience. *Id.* at 1334-35.

This court does not accept defendants' contention that in-person absentee voting is always a convenience and thus not actionable under § 2 as interpreted in *Hood.* The Supreme Court stated, "[e]ven without going beyond the plain words of the statute, we think it clear that the location of polling places constitutes a 'standard, practice, or procedure with respect to voting.' " *Perkins*, 400 U.S. at 387. The Senate Report makes clear that the comparative availability of absentee voting is also actionable under § 2. S. Rep. No. 97-417,

15

at 30 n.119 (1982) ("[T]he statute's scope is illustrated by a variety of Section 2 cases involving such episode discrimination. For example, a violation could be proved by showing that the election officials made absentee ballots available to white citizens without a corresponding opportunity being given to minority citizens.") Also, plaintiffs are not simply asserting that it would be easier to vote absentee in-person than voting absentee by mail or voting on election day in person. Rather, the crux of plaintiffs' § 2 claim is that the location of in-person absentee voting in Jackson County interacts with the socioeconomic factors of poverty and lack of access to transportation to deprive plaintiffs and other Native Americans who would like to vote absentee in-person—particularly at the time of registration—of an equal opportunity to vote. The ability to vote absentee in-person must be viewed in conjunction with practical realities— such as poverty and lack of transportation—that exist on the Pine Ridge Reservation and must be compared to the opportunity to vote available to other Jackson County white citizens.

Defendants advance an argument accepted by the court in *Hood* that allowing this § 2 claim would open the floodgates to other similar claims that should not be actionable under § 2. Docket 23 at 18-20. But the fact that one county may have more satellite locations than another, or that one state may offer absentee voting while another does not, is missing a key element of a § 2 claim: less opportunity for a protected group to participate in the political process. In *Hood*, the plaintiffs did not prevail on their § 2 claim because there was no evidence that the placement of early polling sites resulted in unequal

16

access. *Hood*, 351 F. Supp. 2d at 1334-35. Similarly, the hypothetical examples put forward by defendants contain no facts suggesting a disproportionate impact on minority voters resulting from a voting standard, practice, or procedure.[9]

Defendants also argue that plaintiffs have failed to allege a causal connection between the challenged practice and the alleged harm. Docket 23 at 20-24. Defendants primarily rely on *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012), and *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015). In *Gonzalez*, the plaintiff's § 2 claim failed because the plaintiff did not produce evidence or expert testimony on the relationship between the challenged voter identification law and the opportunity of Latinos to participate in the political process. *Gonzalez*, 677 F.3d at 405-07. In this case, plaintiffs are not required to make an evidentiary showing or produce expert testimony to survive a motion to dismiss. The complaint alleges:

---

[9] Defendants argue that residents of the town of Belvidere in Jackson County would have a cognizable § 2 claim if the court accepts plaintiffs' theory of this case. Docket 23 at 20. In so arguing, defendants gloss over the striking statistical disparities in the minority populations of Kadoka (94.5 percent white) and Wanblee (95.5 percent Native American) and the relative socioeconomic positions of those groups. *See* Docket 1 at 6-8. A § 2 claim only exists when, based on a totality of the circumstances, a voting standard, practice, or procedure deprives a protected group of an equal opportunity to vote. Thus, it is not true that any town without a satellite in-person absentee voting location necessarily has a viable § 2 claim. According to defendants, Belvidere has a population of 49 people, 14 percent of whom are Native American. Docket 23 at 20. A bare showing that the town of Belvidere is 14 miles from Kadoka and has a population that is 14 percent minority is insufficient to establish a viable § 2 claim under the theory presented by plaintiffs.

17

> *As a result* of Defendants' refusal to establish the proposed satellite
> office in Wanblee, Plaintiffs and other Native American citizens
> residing in Jackson County . . . have substantially less opportunity
> than the white population to avail themselves of the convenience
> and benefits of casting in-person absentee ballots and using in-
> person registration . . . *As a consequence*, Native Americans will
> not have an equal opportunity to participate in federal and state
> elections . . . .

Docket 1 at 12-13 (italics added). These allegations are sufficient to show a
causal connection between the challenged voting standard, practice, or
procedure and the harm suffered by the protected group.

Defendants' reliance on *Frank* is also unpersuasive. In *Frank,* the
Seventh Circuit upheld Wisconsin's voter identification law because the law
itself imposed equal burdens on all citizens, and any statistical disparity was
not the result of the law itself but of the failure of low income groups to use the
opportunity to vote. *See Frank*, 768 F.3d at 753-55. And the panel noted that
because Wisconsin had not made it "*needlessly* hard to get photo ID, it has not
denied anything to any voter." *Id.* at 753 (emphasis in original). Although the
plaintiffs in *Frank* showed no connection between the voter identification
requirement and any impact on their ability to participate in the political
process, plaintiffs have made such allegations here. *See* Docket 1 at 12-13. At
this stage, plaintiffs have sufficiently alleged a causal connection between the
challenged action and their ability to participate in the political process.

Finally, defendants argue that plaintiffs failed to plead any facts
supporting a necessary component of a § 2 claim: that plaintiffs have less
opportunity to elect representatives of their choice. Docket 23 at 24-27. For

18

support, defendants rely primarily on language found in *Chisom v. Roemer*, 501

U.S. 380 (1991):

> [Section 2] does not create two separate and distinct rights. . . .
> The singular form is also used in subsection (b) when referring to
> an injury to members of the protected class who have less
> "opportunity" than others "to participate in the political process
> *and* to elect representatives of their choice." It would distort the
> plain meaning of the sentence to substitute the word "or" for the
> word "and." Such radical surgery would be required to separate the
> opportunity to participate from the opportunity to elect. . . . [All
> § 2] claims must allege an abridgment of the opportunity to
> participate in the political process *and* to elect representatives of
> one's choice. Even if the wisdom of Solomon would support the
> *LULAC* majority's proposal to preserve claims based on an
> interference with the right to vote in judicial elections while
> eschewing claims based on the opportunity to elect judges, we
> have no authority to divide a unitary claim created by Congress.

*Chisom*, 501 U.S. at 397-98 (internal citation omitted) (italics in original).

According to defendants, because plaintiffs did not show that they have less

opportunity to elect representatives of their choice, they have not stated a claim

for relief under § 2.

Defendants' position that *Chisom* requires a § 2 plaintiff to specifically

plead separate facts showing an "*inability* to elect representatives of their

choice" is flawed. Docket 23 at 24 (emphasis added). In *Chisom*, the Supreme

Court was presented with the limited question of whether § 2 extended to cover

state judicial elections. *Chisom*, 501 U.S. at 390 ("[T]his case presents us solely

with a question of statutory construction. That question involves only the scope

of the coverage of § 2 . . . . We therefore do not address any question

concerning the elements that must be proved to establish a violation of the Act

or the remedy that might be appropriate to redress a violation if provided.").

19

The Supreme Court interpreted § 2 broadly to include judicial elections. *Id.* at 403. ("[T]he Act should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination."). Thus, *Chisom* expressly disclaimed the purpose for which defendants now seek to use it.

Moreover, neither § 2 nor *Chisom* requires a plaintiff to show an *inability* to elect representatives. Rather, the statutory test is whether a voting standard, practice, or procedure results in a minority group having less opportunity to participate in the political process and elect representatives of their choosing. And *Chisom* states that "[a]ny abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election." *Id.* at 397. It is reasonable to infer that if plaintiffs and other Native Americans are prevented from voting by legal and practical obstacles, they would have less opportunity to elect representatives of their choice. Thus, plaintiffs have sufficiently alleged that they have less opportunity than white residents of Jackson County to both participate in the political process and elect representatives of their choice because a voting standard, practice, or procedure makes it more difficult for them to vote compared to other residents of Jackson County.[10]

---

[10] *White v. Regester*, 412 U.S. 755 (1973), and *Whitcomb v. Chavis*, 403 U.S. 124 (1971) were vote dilution cases, which require a plaintiff to show that a districting or apportionment plan has the effect of diluting minority voting strength even though minorities still have access to the ballot. *See generally Gingles*, 478 U.S. at 47-51. In that context, "the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process."

Defendants also cite *Jacob v. Board of Directors of Little Rock School District*, No. 4:06-CV-01007 GTE, 2006 WL 2792172 (E.D. Ark. Sept. 28, 2006), for the proposition that a § 2 plaintiff must show "an inability to vote." Docket 23 at 25-27. Like *Hood*, *Jacob* was a motion for a preliminary injunction, which requires a plaintiff to show a likelihood of success on the merits—a different standard than pleading facts that state a claim for relief. *Jacob* found that data showing African-American candidates for school board fared well refuted plaintiffs' assertion that minority voters had less opportunity to elect representatives of their choice and therefore the plaintiffs "failed to present any evidence or even a colorable theory" supporting a § 2 violation. *Jacob*, 2006 WL 2792172, at *2. Here, plaintiffs carry no burden of proof at this early stage of litigation, and there are no facts or evidence refuting plaintiffs' claim that they have less opportunity to elect representatives of their choice because they experience more difficulty voting.

Plaintiffs have pleaded facts supporting the necessary elements of a § 2 claim and have introduced factual allegations that could weigh some of the Senate factors in their favor. Thus, dismissal of plaintiffs' § 2 claim at this stage of litigation for failure to state a claim is inappropriate.

## III. Discriminatory Purpose Claim

In their second claim for relief, plaintiffs allege that defendants acted with a discriminatory purpose, in violation of the VRA, the Fourteenth Amendment, and 42 U.S.C. § 1983. Docket 1 at 14-15. In addition to

---

*Chisom*, 501 U.S. at 397.

prohibiting voting standards, practices, or procedures that result in less
opportunity for protected groups to participate in the political process, § 2 also
prohibits purposeful discrimination. *See* S. Rep. No. 97-417, at 27 (1982)
("Plaintiffs must either prove such intent, or, alternatively, must show that the
challenged system or practice . . . results in minorities being denied equal
access to the political process.").

Such discrimination may also violate the Fourteenth Amendment. *See
Reynolds*, 377 U.S. at 554. "[I]n order for the Equal Protection Clause to be
violated, 'the invidious quality of a law claimed to be racially discriminatory
must ultimately be traced to a racially discriminatory purpose.' " *Rogers v.
Lodge*, 458 U.S. 613, 617 (1982) (quoting *Washington v. Davi*s, 426 U.S. 229,
240 (1976)). "A plaintiff challenging the constitutionality of a discriminatory
electoral system must prove, by a preponderance of the evidence, that the
defendant had racially motivated discriminatory intent in enacting or
maintaining a voting practice." *Whitfield v. Democratic Party of the State of Ark.*,
890 F.2d 1423, 1426 (8th Cir. 1989) (citing *Perkins v. City of West Helena, Ark.*,
675 F.2d 201, 207 (8th Cir. 1982)).

Plaintiffs and defendants agree that the proper framework for
determining whether a plaintiff has established purposeful discrimination is
found in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977). Docket 27 at 29-30; Docket 28 at 16. To show intentional
discrimination, an important starting point is the impact of the challenged
official action and whether it bears more heavily on a minority group. *Arlington*

*Heights*, 429 U.S. at 266. Additionally, courts look to the historical background of the decision, the specific sequence of events leading up to the decision, whether the decision involved any substantive departures from normal procedure, and any available legislative history. *Id.* at 266-67.

Defendants contend that the complaint fails to state a claim for a constitutional violation because it does not contain any facts showing that defendants intended to discriminate when they did not establish the satellite office in Wanblee. Docket 23 at 11-12. The complaint alleges that HAVA funding was available to establish a satellite office in Wanblee (Docket 1 at 9-11); that defendants knew the HAVA funding was available (*Id.* at 9 (alleging that Jackson County was provided with regular updates on the availability of HAVA funding)); and that the reason defendants gave for not establishing the satellite office was because funding was not available (*Id.* at 9, 12). At this stage of litigation, the court assumes those facts to be true and draws all reasonable inferences from those facts in favor of plaintiffs. Based on the facts in the complaint, it is reasonable to infer that defendants knew that the funding justification was not true at the time they made the decision not to establish the satellite office. According to the complaint, the official action bears more heavily on minority voters and occurred against a backdrop of historical discrimination. Thus, the complaint alleges sufficient facts to state a claim for relief based on intentional discrimination.[11]

---

[11] In their reply brief, defendants contend that plaintiffs are required to show that defendants' actions were without a rational basis. *See* Docket 28 at

23

Defendants point the court to *Denis v. New York City Board of Elections*, No. 94 CIV. 7077 (KMW), 1994 WL 613330 (S.D.N.Y. Nov. 7, 1994). Docket 23 at 12-13. In that opinion, the district court found on reconsideration that dismissal of plaintiffs' Equal Protection claim was appropriate because plaintiffs had not shown that minority voters were intentionally turned away from the polls or that mechanical irregularities were intended to suppress minority votes. *Denis*, 1994 WL 613330, at *3. While *Denis* confirms that intent is part of an Equal Protection claim, it does not shed any additional light on this situation because the *Denis* court simply found that plaintiffs had not shown intent. For the reasons stated above, plaintiffs in this case have alleged sufficient facts to show that a discriminatory purpose may have been a motivating factor in the decision not to establish a satellite office in Wanblee.

Defendants also cite to *Frank* and *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), two cases upholding voter identification requirements. Docket 23 at 12-14. Defendants argue that this case, like *Frank* and *Crawford*, amounts to no more than an inconvenience that does not impose a substantial burden on the right to vote and is not tied to race. *Id.* at 13. In *Frank* and *Crawford*, the challenges to voter identification laws were rejected because all citizens had to shoulder the same burden to get acceptable

---

17 (citing *Gustafson v. Ill. State Bd. of Elections*, No. 06 C 1159, 2007 WL 2892667, at *8 (N.D. Ill. Sept. 30, 2007)). *Gustafson,* however, was an order granting summary judgment that applied rational basis review to the equal protection claim because there was no discriminatory component to the claim. Thus, *Gustafson* presented a different claim in a different procedural posture than the present case.

identification. *See, e.g., Frank*, 768 F.3d at 751-55 (citing *Crawford* and discussing the burden imposed by voter identification laws). Unlike voter identification cases, in which all voters are subject to the same inconvenience, the complaint in this case alleges that the challenged action places a burden on Native Americans that is not placed on white citizens of Jackson County. Thus, the reasoning in *Frank* and *Crawford* does not conclude the analysis in this case.

The constitutional claim discussed above serves as the basis for plaintiffs' claim under § 1983. *See* Docket 1 at 14. Section 1983 provides a cause of action against any "person who, under the color of any statute, ordinance, regulation, custom, or usage, of any state" causes the deprivation of a right protected by federal law or the United States Constitution. 42 U.S.C. § 1983. "[T]o state a claim for relief under § 1983, a plaintiff must allege sufficient facts to show '(1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right.' " *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (quoting *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009)). Here, defendants solely argue that because there is insufficient evidence of a constitutional violation, plaintiffs have not stated a claim for relief under § 1983. Docket 23 at 14-17. For the reasons stated above, plaintiffs have alleged sufficient facts to state a claim for relief based on intentional discrimination. Thus, dismissal of plaintiffs' § 1983 claim is improper at this time.

25

**CONCLUSION**

At this stage of litigation, the court assumes all of the well-pleaded allegations in the complaint to be true. The complaint in this case includes allegations that could support a finding of both a discriminatory result and a discriminatory purpose. Accordingly, it is

ORDERED that defendants' motion to dismiss in lieu of an answer (Docket 22) is denied. Defendants' answer is due by **May 11, 2015.**

IT IS FURTHER ORDERED that plaintiffs' motions for a preliminary injunction (Docket 13), judicial notice (Docket 14), and not to consolidate the preliminary and permanent injunctions (Docket 15) are denied as moot.

Dated May 1, 2015.

BY THE COURT:


*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

26